STATE of Missouri, Respondent,

v.

William W. DAWSON, Appellant.

No. WD 54430.

Missouri Court of Appeals,
Western District.

Feb. 23, 1999.

Thomas J. Cox, Kansas City, for appellant.

Bronwyn Werner, Asst. Pros. Atty., Kansas City, for respondent.

Before BRECKENRIDGE, C.J., HANNA and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Chief Judge.

Following a bench trial, William Dawson was convicted of stalking, pursuant to § 565.225, RSMo 1994,[1] and third degree assault, pursuant to § 565.070. Mr. Dawson was sentenced to one year in the Jackson County Department of Corrections for the stalking conviction. Execution of the sentence was suspended and Mr. Dawson was placed on probation for two years beginning at the completion of the sentence on the assault conviction. On the assault charge, Mr. Dawson was sentenced to fifteen days in the Jackson County Department of Corrections, with delayed execution pending appeal. Mr. Dawson appeals both convictions, raising five points of error. First, he contends that the trial court erred in admitting evidence on the stalking charge that was irrelevant, with-

---

1. All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise indicat- ed.

out proper foundation and relating to events which occurred outside of the statute of limitations. Second, Mr. Dawson claims the court erred in denying his motion for a judgment of acquittal and finding him guilty of stalking because there was insufficient evidence upon which to convict him. Third, Mr. Dawson challenges the validity of the search warrant and claims the trial court erred in admitting fruits of the warrant. Fourth, Mr. Dawson claims his conviction for assault was not supported by sufficient evidence because there was no evidence that physical contact occurred. Finally, Mr. Dawson argues that an insufficient foundation was laid for admission of the victim's drinking mug and testimony relating to the mug.

This court finds that there was insufficient evidence to convict Mr. Dawson of stalking and that conviction is reversed. Therefore, it is irrelevant whether the evidence relating to the stalking charge was properly admitted. This court finds that the search warrant was supported by probable cause and the evidence discovered by the warrant was properly admitted. The court further finds that sufficient evidence of physical contact was presented to sustain the assault conviction. Finally, the court finds there was a sufficient foundation for the admission of evidence relating to the victim's mug and that evidence was properly admitted. The judgment is affirmed in part and reversed in part.

### Factual and Procedural Background

Edna Nichols Pete began working in the mail room and sample room at Stuart Hall in March of 1952. She met Mr. Dawson, who was also employed at Stuart Hall, in 1967. In 1976, she began working as a receptionist for Stuart Hall. Stuart Hall employed approximately 200 to 250 people in 1995. As a receptionist, Ms. Pete worked in the front office and not in the plant area. Mr. Dawson was a manager, and he was also employed in the front office. While Ms. Pete was employed at Stuart Hall, the plant workers rarely came into the front office. When they did, they were distinguishable from the office staff by their attire. Because the Stuart Hall facility was located in an industrial area, the general public did not generally wander into the building. The office did not open to the public until 8:00 a.m., and visitors to the facility usually did not arrive before 8:00 to 8:30 a.m. Mr. Dawson always arrived at work by 7:00 a.m.

In the 1980's, Ms. Pete began finding an unusual substance on her telephone. The substance was sticky and white. She found this substance on her work telephone at her desk approximately three to four times a year for the ten to fifteen years before 1995. The last time she found it was in July of 1995. In August of 1995, she found the substance on her car window while it was parked in the Stuart Hall parking lot.

Ms. Pete described her morning routine as beginning at approximately 6:45 a.m., when she would arrive at her desk and put away her personal items. After putting away her things, Ms. Pete would then take her coffee cup and water mug to the kitchen on the second floor, where she made coffee and sat until approximately 7:15. After filling her coffee cup and water mug in the kitchen, she would return to her desk on the first floor, with her cup and mug, to begin work. On September 19, 1995, after returning from the kitchen, she left her cup and mug on her desk while she went to the mail room. She testified that she was in the mail room approximately eight to ten minutes.

When she returned, Ms. Pete picked up her water mug and took a drink through the straw. She noticed a bitter taste. When she looked at the mug she saw a white substance on the mug's lid, near the straw hole. Ms. Pete testified that she was extremely upset and surmised that the white substance she found in her mug was semen. She immediately called either David Hemmer, vice-president of finance, or Richard Miller, vice-president of human resources. She then participated in compiling a list of men who were present or were typically present at Stuart Hall in the early morning hours. Mr. Miller was responsible for assembling the list and also spoke with other employees regarding those present that morning. In all, a list of seven men, including Mr. Dawson, was compiled.

Mr. Kelly then took the mug to personnel supervisor, Christine Mautino. He had Ms.

Mautino place the mug and the lid in separate plastic Ziploc bags, and then placed the bags in a refrigerator in a locked room across from the Human Resources Department. Mr. Kelly accompanied Ms. Mautino into the storage room and he locked the door when they left. The police were contacted the next day.

When the police arrived, Mr. Kelly took Officer Scott Emory to the storage room, where he unlocked the door and opened the refrigerator. The bags containing the lid and mug were then removed from the refrigerator and Officer Emory took them to the East Patrol Division, where he packaged the items in an evidence bag. He sealed the evidence bag, marked it with his initials, and placed a card with the case report number on it. He then placed it in a locked closet in the East Patrol property room. The Regional Crime Lab performed tests to determine the identity of the substance on the mug and lid. The tests confirmed that the substance was semen.

After the results confirming the identity of the substance on the mug and lid were reported to Stuart Hall, Mr. Miller and Mr. Kelly conducted individual interviews in Mr. Miller's office with each of the seven men on the list. Mr. Miller explained the situation and asked each person to give a blood sample. Initially, all seven men indicated that they would give a blood sample. On December 5, 1995, Officer Peter Aretakis and Mr. Kelly met four of the men at Baptist Medical Center to have blood samples taken. Mr. Dawson was not present that day. On December 6, 1995, two more men gave blood samples. Again, Mr. Dawson did not report to the hospital for testing.

On December 5, 1995, Mr. Kelly attempted to contact Mr. Dawson at work to inform him they had rescheduled the tests, but Mr. Dawson had already left for the day. The next day, when Mr. Kelly approached Mr. Dawson about voluntarily giving a blood sample, he again indicated he would volunteer. However, later that day he told Mr. Kelly that he would not give a blood sample, participate or cooperate at that time because he did not trust Mr. Miller.

Around February 10th, Officer Barbara Baker, having taken over the investigation, received the results of the blood tests and the laboratory comparison of the samples to the semen found in the mug. She was informed that the tests excluded all six men as sources of the semen. She then completed a pick-up form for Mr. Dawson. The pick-up was issued on the basis of evidence indicating that there were seven people known to be around Ms. Pete's desk on the morning in question and all but Mr. Dawson were eliminated as possible sources of the semen, and because Mr. Dawson was employed at Stuart Hall during the entire ten to fifteen year period of time Ms. Pete alleged the other incidents had occurred.

On February 12, 1996, Detective Wayne Owings, pursuant to the pick-up order, arrested Mr. Dawson at Stuart Hall. Using Detective Baker's case file, Detective Owings collected information necessary to fill out a search warrant application to obtain a sample of Mr. Dawson's blood. He obtained the search warrant, and later that day, he and Detective Baker took Mr. Dawson to Baptist Medical Center to obtain a blood sample. Tests later confirmed that Mr. Dawson's DNA matched the DNA in the semen found in Ms. Pete's mug.

Mr. Dawson was charged with stalking and third degree assault. On November 6, 1996, a suppression hearing was held in which Mr. Dawson challenged the search warrant. Mr. Dawson questioned the warrant affidavit because there was no statement of witness credibility and the signing officer did not investigate the facts in the affidavit himself. On November 7, 1996, Judge Dean issued his order denying the motion to suppress, finding the affidavit supported probable cause. On February 24, 1997, a bench trial was held. Mr. Dawson did not offer any evidence. The trial court found Mr. Dawson guilty on both counts. This appeal followed.

## Insufficient Evidence of a "Course of Conduct" To Sustain Stalking Conviction

■ Because the court's determination of Mr. Dawson's second point is dispositive of the stalking conviction, it will be addressed

first. Mr. Dawson challenges the sufficiency of the evidence supporting his conviction for stalking under § 565.225. This court reviews the sufficiency of the evidence in a court-tried criminal case by applying the same standard used in a jury-tried case. *State v. Rehberg*, 919 S.W.2d 543, 552 (Mo.App.1995). Appellate review of the sufficiency of the evidence to support a guilty verdict is limited to a determination of whether the State presented sufficient evidence from which the trier of fact could have reasonably found the defendant guilty. *Id.* In determining whether the conviction is supported by sufficient evidence, the court examines the evidence and inferences in the light most favorable to the verdict, ignoring all contrary evidence and inferences. *State v. Martin*, 940 S.W.2d 6, 8 (Mo.App.1997). The function of the reviewing court is not to reweigh the evidence, but to determine if the conviction is supported by sufficient evidence. *Id.* This same standard applies to the court's review of both direct and circumstantial evidence. *State v. Kee*, 956 S.W.2d 298, 300–01 (Mo.App.1997).

"A verdict of guilty must rest on proof beyond a reasonable doubt of each element of the crime charged against the defendant." *State v. Conway*, 786 S.W.2d 165, 168 (Mo.App.1990). Mr. Dawson was charged with stalking Ms. Pete under § 565.225.2. To convict Mr. Dawson of stalking under § 565.225.2, the State must prove beyond a reasonable doubt that Mr. Dawson purposely and repeatedly harassed Ms. Pete. "Harass" is defined by the statute as "engag[ing] in a *course of conduct* directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress, and that actually causes substantial emotional distress to that person." Section 565.225.1(3) (emphasis added). A "course of conduct" is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." Section 565.225.1(1). The conduct which was the basis for the stalking charge against Mr. Dawson was that:

> [B]etween January 1, 1987 and September 19, 1995, in the County of Jackson, State of Missouri, the defendant repeatedly and purposely harassed Edna F. Nichols [Pete] by placing his semen on her work telephone, automobile and in her water mug and thereby caused substantial emotional distress to the victim.

Mr. Dawson claims that the State did not present sufficient evidence connecting him with the telephone or the car window incidents and has therefore failed to establish the repeated acts constituting a course of conduct as required by the statute.

The State presented evidence showing that Ms. Pete found a sticky white substance on her work telephone three to four times a year for a ten-to-fifteen-year period, the last time being in July 1995. There was also evidence that she found a similar substance on the window of her car while it was parked in the Stuart Hall lot in August of 1995, and finally in a mug from which she was drinking water while at her desk at Stuart Hall on September 19, 1995. Tests were performed on the substance found in the mug, which revealed that the substance was semen.

A telephone from the receptionist's desk was also examined and semen was found inside the mouthpiece of the phone. However, the telephone that was tested was removed from the receptionist's desk in 1997, nearly eighteen months after Ms. Pete reported finding the sticky substance on her telephone. The phone tested was one of at least three phones compatible with the receptionist's switchboard. Other than Ms. Pete's testimony that it looked like the phone she had used at the time she found the sticky substance on her phone, there was no evidence that it was the phone on which Ms. Pete found the substance in 1987 to 1995. The forensic chemist who identified the semen in the mouthpiece testified that she could not determine how long the semen had been on the phone or whose semen it was, because the sample found on the telephone was not sufficient to test for DNA. As to the sticky substance found on Ms. Pete's car window, it was never identified, except Ms. Pete testified that the substance she found on her car window and the telephone appeared to be similar to the substance she found in her mug. Thus, the only substance that was tested and identified as semen be-

longing to Mr. Dawson was the substance found on the mug.

Mr. Dawson was employed at Stuart Hall the entire ten-to-fifteen-year period during which Ms. Pete found the sticky substance on her belongings, but there was no evidence that he was present at any of the specific times the sticky substances were placed on her phone and car window.

■ The question is whether this is sufficient evidence from which the trier of fact could have found, beyond a reasonable doubt, both that Ms. Pete had been subjected to a pattern of criminal behavior, and that Mr. Dawson committed the acts constituting the crime. *See State v. Davis*, 797 S.W.2d 560, 563 (Mo.App.1990) (State must demonstrate accused's criminal action in addition to establishing the corpus delecti of the crime). The State may prove its case by presentation of either direct or circumstantial evidence connecting Mr. Dawson to each element of the crime. *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc 1993). Reasonable inferences may be drawn from both the direct and circumstantial evidence. *See id.* at 412–13. However, the inferences must be logical, reasonable and drawn from established fact. *State v. Friend*, 936 S.W.2d 824, 828 (Mo.App. 1996); *State v. Hyde*, 682 S.W.2d 103, 106 (Mo.App.1984).

■ To connect Mr. Dawson with all of the incidents and establish a course of conduct constituting harassment under the stalking statute, the trial court had to infer from the evidence of Mr. Dawson's involvement in the mug incident that he was responsible for the substance found on the telephone and Ms. Pete's car. The fact that Mr. Dawson was involved in the mug incident is the only evidence connecting him to the substances found on the car and the telephone. Prior Missouri case law indicates that the analysis required to infer from his involvement in the mug incident that he was involved in all three incidents employs reasoning which is too attenuated and based on evidence which is too remote and uncertain to constitute proof beyond a reasonable doubt. *See, e.g., State v. Bailey*, 645 S.W.2d 211, 214–15 (Mo.App.1983); *State v. Woods*, 585 S.W.2d 236, 238–39 (Mo.App.1979).

In *Bailey*, the issue was whether the evidence that the defendant burned a stolen motorcycle was sufficient to prove that he also burglarized a garage and stole the motorcycle. 645 S.W.2d at 213. In response, the defendant argued that the State presented no evidence connecting him to the burglary and that it was impermissible to infer from the evidence showing that he burned the motorcycle, that he also stole it. *Id.* at 214. The Court of Appeals agreed with the defendant, stating, "[N]o evidence whatever placed Bailey at or near the location of the garage...." *Id.* The court found that the State's case "depended entirely upon the inference that if Bailey set the motorcycle on fire, he must have been the culprit who had earlier entered the garage and stolen it." *Id.*

Recognizing that reasonable inferences are permissible, the court explained that an inference may not be used to prove an element of a crime when no facts support the inference. Id. "This standard intends to guard against attenuated reasoning based on evidence too remote or uncertain or lacking in probative force." *Id.* The court held that while the State's evidence permitted the inference that someone stole the motorcycle from the garage, that evidence did not show that Bailey was the thief. *Id.* at 215. The court found that it was not reasonable to infer from the evidence that Bailey burned the motorcycle, that he broke into the garage and stole the motorcycle. Therefore, the court reversed Bailey's burglary conviction, concluding that the conviction was "supported by no proven facts whatever but depended entirely on speculation and conjecture." *Id.*

In *Woods*, the defendant was convicted of stealing five head of cattle. 585 S.W.2d at 237. On appeal, Woods argued that the trial court erred in submitting MAI–CR 2.10, paragraph two, because the Notes on Use required that the paragraph be omitted "if there was no evidence that defendant was present at or near the scene of the crime."[2]

---

2. Paragraph two of MAI CR 2.10 stated:

 *The presence of a person at or near the*

The same day the cattle were stolen, Woods was in the vehicle that was used to steal the cattle and that he helped unload the stolen cattle from the truck. *Id.* at 238. The court found that to connect Woods with the crime of stealing, "it would ... be necessary to infer that from his later occupancy of the vehicle and subsequent conduct that he was present at or near the scene of the stealing at the time it was committed...." *Id.* at 239. The court concluded that this inference was not permissible. *Id.*

The inference in this case is similar to the inferences the courts rejected in *Bailey* and *Woods*. Like in *Bailey* and *Woods*, the State has no evidence showing that Mr. Dawson committed two of the three acts forming the basis of his stalking conviction. Instead, the State relies upon inferences from facts which prove that he committed the third act, putting semen on the mug, to show that he was the person who committed the other two acts charged, putting semen on the car and the telephone. To reason from the above evidence to the conclusion that Mr. Dawson was responsible for placing semen on the car and the telephone would require conjecture and speculation. This evidence is insufficient to connect Mr. Dawson to the car and telephone. *See also Friend,* 936 S.W.2d at 828 (it could not be reasonably inferred from evidence that defendant was sitting in truck behind the steering wheel when officer arrived that defendant backed the truck up to trailer in furtherance of theft of trailer).

Without evidence from which it can be reasonably inferred that Mr. Dawson placed semen on the car and the phone, the State has failed to prove that he was involved in a course of conduct constituting harassment, and therefore, the stalking conviction is reversed. Because reversal of Mr. Dawson's stalking conviction renders his first point on appeal moot, it will not be considered. However, although we reverse the stalking conviction, Mr. Dawson raised three points on appeal concerning his conviction for assault which must be addressed.

scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be

## The Search Warrant Was Supported by Probable Cause

In his first challenge to his assault conviction, Mr. Dawson avers that the search warrant compelling him to give a blood sample was without probable cause and the blood sample acquired thereby should have been suppressed. In deciding if probable cause exists to issue a warrant, a neutral judge must assess the totality of the circumstances to "determine whether a search warrant application and its supporting affidavits demonstrate a fair probability that ... evidence of a crime will be found in a particular place." *State v. Hill,* 929 S.W.2d 258, 262 (Mo.App. 1996). The task of the appellate court is to determine, upon review of the four corners of the supporting affidavits, whether the judge had a substantial basis for concluding that probable cause existed. *Id.* This court gives great deference to the issuing judge's decision, and will reverse the finding only upon a clear showing of abuse of discretion and clear error. *Woodworth,* 941 S.W.2d at 695.

The warrant application and affidavit submitted by Detective Owings set forth the following facts:

The victim, Edna Nichols [Pete], then 59 years old, reported she set her insulated mug with ice water on her desk at 5414 Front Street, Kansas City, Jackson County, Missouri. Ms. [Pete] then went to the mail room for eight to ten minutes. When she returned to her desk, she took a drink of water through her straw and noticed it tasted bitter. She then noticed a white substance on the lid of her cup, which was by the hole in the lid made to drink from. Ms. [Pete] stated she immediately reported the incident. Ms. [Pete] and two superiors, Richard Miller and David Hemmer, sat down and composed a list of seven persons who were there at that time.

The insulated mug was examined at the Regional Crime Lab. Results of a smear taken from the top of the cup reveals "intact spermatozoa were located on this smear confirming the presence of semen."

considered together with all of the evidence in determining his guilt or innocence. *Woods,* 585 S.W.2d at 237 n. 2.

Mr. Stephen Kelly, Manager of Industrial Relations, 5414 Front Street, stated he obtained the list of seven names from Mr. Miller. The seven names are as follows: Darrin J. Anderson, w/m, 5–17–68; William W. Dawson, w/m, 4–21–43; David G. Hemmer, w/m, 1–28–54; Dennis L. Patterson, w/m, 8–6–52; George E. Schweikhardt, w/m, 4–4–51; Gerald Shepherd, b/m, DOB unknown; and Charles C. Wolfenbarger, w/m, 5–1–45. Mr. Kelly stated that he and Mr. Miller met individually with each of the seven individuals named on the list. At that time, each of the seven agreed to provide a blood sample. On 12–5–95, the following persons responded to Baptist Hospital and voluntarily submitted a blood sample: George Edward Schweikhardt, Dennis L. Patterson, Charles C. Wolfenbarger, and Darrin J. Anderson. On 12–6–95, the following two persons responded to Baptist Hospital and voluntarily submitted a blood sample: David G. Hemmer and Gerald Shepherd. Mr. Kelly stated that he talked with Mr. William Dawson about submitting a blood sample. Initially, Mr. Dawson agreed, however, the day the test was to be done, Mr. Dawson stated that he did not trust Rich Miller and would not give a sample.

Blood samples obtained from George Edward Schweikhardt, Dennis L. Patterson, Charles C. Wolfenbarger, Darrin J. Anderson, David G. Hemmer, and Gerald Shepherd were submitted to the Regional Crime Lab for analysis. The results of those examinations reveal "the semen located on the travel mug does not match any of the blood standards from D. Patterson, G. Schweikhardt, D. Anderson, C. Wolfenbarger, D. Hemmer, or G. Shepherd."

This affidavit established probable cause to issue a search warrant. The affidavit stated that semen was found in Ms. Pete's mug and that seven people were in the area of her mug at the time the incident occurred. The affidavit eliminates six of the seven people listed by reporting the negative results of blood tests comparing the blood of the six individuals to the semen found in the mug. Therefore, of the seven possible sources of the semen, only one had not been tested and eliminated.

Mr. Dawson asserts that his refusal to voluntarily submit to the search is not a sufficient basis to establish probable cause. Without ruling on whether Mr. Dawson's refusal to voluntarily submit to his employer's request for a blood test is relevant in establishing probable cause, this court emphasizes that his refusal is not necessary as the basis for finding probable cause. Rather, probable cause is established from the totality of the circumstances as set forth in the affidavit, including the fact that Mr. Dawson was the only remaining person on the list who was present at the relevant time and who had not been eliminated from suspicion by a negative blood test. Based upon the four corners of the affidavit and viewed in light of the totality of the circumstances as indicated in the affidavit, probable cause to issue a warrant for a sample of Mr. Dawson's blood was established by eliminating all other possible suspects who had access to Ms. Pete's mug during the relevant time frame, and not from his refusal to voluntarily submit to the test.

 Mr. Dawson also attacks the validity of the supporting affidavit because it was based on hearsay and did not indicate a substantial basis for crediting the hearsay. In determining whether probable cause exists to issue a search warrant, "the issuing judge 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Hammett*, 784 S.W.2d 293, 295 (Mo.App.1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). "Probable cause for the issuance of a search warrant must be judged on the basis of what was before the issuing judge." *State v. Hunt*, 454 S.W.2d 555, 558 (Mo.1970). An affidavit which relies on hearsay is sufficient as long as there is a substantial basis for crediting the hearsay. *Hammett*, 784 S.W.2d at 296. Hearsay in an affidavit may be found reliable when it is based on person-

al observation and it is corroborated. *State v. Hill*, 854 S.W.2d 814, 818 (Mo.App.1993). Corroboration can come from varying sources. *Id.* "When the information upon which the warrant is based comes from one who claims to have witnessed a crime or to have been the victim of a crime, the information carries with it indicia of reliability and is generally presumed to be reliable." *State v. Belcher*, 805 S.W.2d 245, 250 (Mo.App.1991). Additionally, hearsay information in a search warrant affidavit from an ordinary citizen is "more deserving of a presumption of reliability than are informants from 'the criminal milieu.'" *State v. Dudley*, 819 S.W.2d 51, 54 (Mo.App.1991).

■ In this case, the hearsay in the affidavit did not come from anonymous informants. The hearsay was from identified citizens, including the victim, Ms. Pete, thereby reducing the reliability concern. *See id.; Belcher*, 805 S.W.2d at 250. Also, the affidavit relied upon various sources of information. Ms. Pete and Mr. Kelly both spoke directly with the affiant officer. Ms. Pete's statements corroborated Mr. Kelly's statements and both Ms. Pete and Mr. Kelly's statements were corroborated by the acts observed by police officers investigating this crime. Corroboration from other witnesses and from independent observations of police officers creates a substantial basis for crediting the hearsay statements in an affidavit. *See Hill*, 854 S.W.2d at 818. In addition, there was nothing before the issuing judge to cause the judge to believe that "the list of seven persons who were there at the time" was the product of "fifth-hand hearsay," as asserted by Mr. Dawson. Therefore, any hearsay in the affidavit does not defeat the issuing court's finding of probable cause, nor does admission of the fruits of the warrant constitute an abuse of the trial court's discretion.

Mr. Dawson further alleges that due to the omission of material facts in the affidavit, the application for the search warrant was misleading and, therefore, the issuing court did not have a sufficient basis to find probable cause. Mr. Dawson alleges that the affidavit for the search warrant should have included the following facts: (1) the incident was not reported to the police until a day after the substance was found on the mug; (2) Ms. Pete's desk was near the front door and was accessible to the public and all 250 to 300 Stuart Hall employees; (2) the information received from Mr. Kelly as to the seven persons on the list of possible sources of the semen was not compiled through personal observation, but was compiled as a result of interviews by Mr. Kelly and Mr. Miller with several female employees who had been in the immediate work area with Ms. Pete and who were not included on the list of possible sources of the semen; (3) Mr. Kelly had told Mr. Dawson that giving a blood sample was purely voluntary; and (4) Mr. Dawson told those persons providing the hearsay information in the affidavit that he was willing to cooperate. Mr. Dawson claims that without the above facts, the affidavit is "clearly misleading."

■ To successfully attack a search warrant on the basis of a misrepresentation under the test established by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), a defendant "must make a substantial showing that the affiant knowingly, intentionally, or with reckless disregard for the truth, included a false statement in the affidavit and that without that false statement the remaining information does not establish probable cause." *State v. Stallings*, 957 S.W.2d 383, 393 (Mo. App.1997). This *Franks* test for a misrepresentation in an affidavit also applies to the omission of statements from an affidavit. *DaVee v. Mathis*, 812 S.W.2d 816, 823 (Mo. App.1991). Therefore, when a defendant alleges a search warrant is invalid because of omitted facts, the challenge must show that (1) the facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading and (2) if the affidavit were supplemented with the omitted facts, the affidavit would not have been sufficient to establish probable cause. *State v. Weide*, 812 S.W.2d 866, 870 (Mo.App.1991).

■ Applying the *Franks* test for omitted facts to the affidavit in this case does not invalidate the search warrant. The first

prong of the *Franks* test is not satisfied because Mr. Dawson made no preliminary showing that Detective Owings omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading. *State v. Miller,* 815 S.W.2d 28, 34 (Mo.App.1991). Moreover, even if the omitted facts had been included in the affidavit, the affidavit would still have been sufficient to support a finding of probable cause to issue a warrant. *Id.* Mr. Dawson's third point is denied.

### Evidence Sufficient to Establish "Physical Contact" as Required by Assault Statute

In his fourth point, Mr. Dawson challenges the sufficiency of the evidence to support his assault conviction under § 565.070.1(5). To convict Mr. Dawson of assault, the State must prove that he "knowingly cause[d] physical contact with another person knowing the other person [would] regard the contact as offensive or provocative." Section 565.070.1(5). As discussed more fully above in connection with Mr. Dawson's challenge to the stalking conviction, appellate review of the sufficiency of the evidence to support a guilty verdict is limited to a determination of whether the State presented sufficient evidence so that the trial court could have reasonably found the defendant guilty. *Rehberg,* 919 S.W.2d at 552. Mr. Dawson claims that the State failed to present sufficient evidence to convict him of assault because there was no evidence of "physical contact" as required by the statute. Mr. Dawson argues that even if the trial court found that he left an offensive substance in Ms. Pete's mug which she then ingested, that is not the type of behavior encompassed by the statute. Therefore, Mr. Dawson asserts that because there was no physical contact, no assault occurred.

■ The statute makes a crime one person *causing* physical contact with another person knowing the other person will find the contact offensive. The term "physical contact" in § 565.070.1(5) has been defined by this court as "the touching of the person of another or something so intimately associated with, or attached to his person to be regarded as a part thereof." *State v. Greathouse,* 789 S.W.2d 50, 52 (Mo.App.1990). The touching may be any kind of contact, and does not have to be in the form of a physical blow. *Id.*

Other states' interpretations of the term "physical contact" are consistent with this court's in *Greathouse.* In *State v. Lutz,* 90 Or.App. 247, 752 P.2d 845, 847 (1988), an Oregon appellate court interpreted the term "physical contact" in the context of Oregon's former harassment statute, which provided that a person committed the crime of harassment if, with the requisite intent, that person subjected another to offensive physical contact. The court held that if the defendant caused a physical object, namely a dog's penis, to come in contact with the victim and that contact is offensive, then the prosecution made out the crime of harassment in the indictment. *Id.*

Interpreting the same statute, the court in *State v. Keller,* 40 Or.App. 143, 594 P.2d 1250, 1252 (1979), held that spitting on another is physical contact within the meaning of the statute. The defendant in *Keller* claimed that while spitting is offensive conduct, it is not physical contact. *Id.* The court noted that the defendant's argument would limit "physical contact" to situations in which the defendant's flesh literally touched the victim's flesh, excluding such acts as hitting another with a stick, a "thrown missile" or hitting a person's clothing instead of their flesh. *Id.* The court rejected the defendant's argument as untenable, finding that spitting on another is physical contact which interferes with the physical integrity of the victim so that it is comparable to slapping or striking. *Id.* at 1252. In *People v. Walker,* 291 Ill.App.3d 597, 225 Ill.Dec. 633, 683 N.E.2d 1296, 1301 (1997), an Illinois appellate court interpreted "physical contact" in the Illinois battery statute to include throwing a liquid substance onto another. The statute defined battery as when a person "knowingly without legal justification and by any means ... (2) makes physical contact of an insulting or provoking nature with an individual." *Id.* (quoting 720 ILCS 5/12–3(a)(2) (West 1994)). The court rejected the defendant's argument that there must be some type of direct touch-

ing for physical contact to occur. *Id.* The court supported its conclusion by analogizing *People v. Peck,* 260 Ill.App.3d 812, 198 Ill. Dec. 760, 633 N.E.2d 222, 223 (1994), a prior case in which the court held that spitting in the face of a police officer amounted aggravated battery. *Id.*[3]

Finally, the Arizona Court of Appeals interpreted the Arizona assault statute to hold that throwing urine on to an officer was sufficient physical contact to constitute an assault. *State v. Mathews,* 130 Ariz. 46, 633 P.2d 1039, 1042 (1981). The statute provided that a person committed the crime of assault by " '[k]nowingly touching another person with the intent to injure, insult or provoke such person.' " *Id.* (quoting A.R.S. § 13–1203(A)(3)). *Id.* The assault conviction in *Mathews* was based upon the inmate defendant faking a blow to a police officer and then throwing a container of liquid on him, which turned out to be human urine. *Id.* Applying ROLLIN M. PERKINS, PERKINS ON CRIMINAL LAW Ch. 2, § 2, at 108 (2d ed.1969), the court found that person-to-person contact was unnecessary. *Id.* The court stated that there could be no doubt that throwing human urine on a person is "touching" within the meaning of the statute. *Id.*

Criminal law treatises provide this court with further guidance in interpreting the type of physical contact necessary for an assault or battery. ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW Ch. 2, § 2, at 153 (3d ed.1982) states that in the context of a battery, an application of force on the person of another can be accomplished by the aggressor himself, or by some force the aggressor puts in motion. The treatise lists administering poison or some other deleterious substance, applying caustic chemicals, and communicating a disease as examples of battery. Id. PERKINS further demonstrates that person-to-person contact is not required for a battery by citing to cases in which spitting, exposing a helpless person to inclement weather, threatening violence which causes a person to jump from a window or moving vehicle, and directing a dog to attack

someone constituted a battery. Id. at 153–54. Additionally, other treatises indicate that the physical contact element of an assault or battery could be satisfied through either direct or indirect touching. 2 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW Ch. 10, § 177 at 414–15 (15th ed.1994); 6A C.J.S. *Assault and Battery* § 70 at 440–42 (1975).

Comparing the Missouri assault statute with the other states' statutes cited above and in light of the treatises' interpretation of the contact required to constitute an assault or battery, this court finds the "physical contact" element in the Missouri statute is similar to the examples cited. This court acknowledges that placing semen in a mug is a more passive act than throwing urine or compelling someone to touch an objectionable object, but it is very similar to placing poison in food. *See State v. Monroe,* 121 N.C. 677, 28 S.E. 547, 548 (1897) (druggist guilty of battery for placing croton oil on a piece of candy sold for non-medicinal purpose). The distinction between active and passive conduct does not defeat the persuasiveness of the analogy between this case and those previously cited. Further, this court is persuaded by other states' interpretation of "physical contact" to extend beyond person-to-person, flesh-to-flesh contact. Based upon careful review of the above case law and treatises, this court finds that, under the circumstances of this case, placing semen in a person's drinking mug constitutes physical contact analogous to the contact in the cases cited. Therefore, viewing the evidence and inferences supporting the verdict in the light most favorable to the verdict, this court finds that the State presented sufficient evidence of physical contact by presenting evidence that Mr. Dawson placed semen in Ms. Pete's mug and she drank it. Mr. Dawson's fourth point is denied.

## Sufficient Foundation Established for Admission of Mug and Testimony Relating to Mug

Mr. Dawson's fifth point on appeal alleges that the trial court erred in

---

**3.** This court notes that the Illinois statute differs from the Missouri statute in that it includes language indicating that the physical contact may occur through "any means." However, this difference in the language of the statutes does not significantly change the interpretation given to "physical contact."

admitting Ms. Pete's mug and lid and testimony regarding those items because the State failed to establish a proper chain of custody for the mug and lid. To receive exhibits and testimony regarding tests performed on those exhibits, the trial court must be satisfied as to the identity of the exhibits and that the exhibits were in the same condition when tested as when they were obtained. *State v. Gustin,* 826 S.W.2d 409, 415 (Mo. App.1992). The proponent of the exhibits must provide the court with a reasonable assurance that the exhibits were not tampered with or contaminated. *State v. Anthony,* 857 S.W.2d 861, 864–65 (Mo.App.1993). This may be proven by evidence establishing a chain of custody of the exhibit. *Gustin,* 826 S.W.2d at 415–17. To prove a chain of custody, the State is not required to provide proof of hand-to-hand custody, nor is the State required to exclude every possibility that the evidence has been disturbed. *Id.* at 415. The trial court has discretion to determine the sufficiency of the evidence establishing the chain of custody of an exhibit. *State v. Murray,* 630 S.W.2d 577, 581 (Mo. banc 1982).

In this case, the State offered the mug and the lid as evidence and introduced testimony regarding tests done on the substance found on the mug and lid. The chain of custody of the mug and lid was established through the testimony of Ms. Pete, Mr. Kelly, Ms. Mautino, Officer Emory and Ms. Netzel. Ms. Pete originally discovered the white, sticky substance on the lid of her mug. Mr. Kelly obtained the mug with the substance on it from Ms. Pete. He then took the mug and lid to the Human Resources Department, where Ms. Mautino placed both of these items in plastic Ziploc bags. Mr. Miller was also present while this occurred. Mr. Kelly then put the Ziploc bags containing the mug and lid in a refrigerator across the hall from the Human Resources office. The refrigerator was located in a locked storage room, to which only Mr. Kelly had the key. When he left the room, Mr. Kelly closed and locked the door.

When the police arrived the next day, Mr. Kelly took Officer Emory to the storage room. Mr. Kelly unlocked the door to the room, and Officer Emory retrieved the mug and lid, still in the two Ziploc bags, from the refrigerator in the locked room. Mr. Kelly testified that the bags containing the mug and lid looked like they were in the same condition as they had been the previous day, and did not appear to have been moved. After retrieving the mug and lid, Officer Emory placed them in a sealed bag and marked it with his initials and the case number. He then placed the evidence in the property room of the East Patrol Division, where he entered the evidence into a log and placed it in a locked closet. Ms. Netzel testified that she received the mug in a sealed evidence bag bearing Officer Emory's name, a serial number and the case number. She then broke the seal of the bag and placed her initials on the bag, indicating that she had broken the seal, retrieved the evidence, examined and returned it, and resealed the bag.

The only possible break in the chain of custody is that there is no evidence as to how the exhibit traveled between the East Patrol evidence locker and the Regional Crime Lab or where the exhibit was kept after the tests. However, there was evidence that Officer Emory put the evidence in a sealed evidence bag and when Ms. Netzel received the bag at the Regional Crime Lab, it was in still in a sealed condition. As previously stated, the State need not provide proof of hand-to-hand custody or exclude every possibility that the evidence has been disturbed. *Gustin,* 826 S.W.2d at 415. We find that the testimony established a chain of custody which offers reasonable assurances that the evidence received and tested by the Regional Crime Lab and admitted into evidence at trial was the same mug and lid and was in a like condition as when it was removed from Ms. Pete's desk, and had not been tampered with or disturbed. The State satisfied its burden of proof. *Id.* The trial court committed no error in admitting Ms. Netzel's testimony concerning the mug and lid.

Because the State presented insufficient evidence of a course of conduct, Mr. Dawson's stalking conviction is reversed. The trial court did not err in admitting evidence obtained by the search warrant, or by admit-

ting the mug and lid and testimony relating to those items. Finally, because the State presented sufficient evidence of physical contact, Mr. Dawson's assault conviction is affirmed.

ELLIS, J., concurs.

HANNA, J., concurs in part and dissents in part.

FOREST W. HANNA, Presiding Judge, dissenting.

I dissent from the reversal of the stalking conviction.