**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Luis RAMIREZ, Leopoldo Alegria-Valencia, Antonio G. Rodriguez,**
**Defendants-Appellants.**

**No. 86–3264.**

United States Court of Appeals,
Fifth Circuit.

Feb. 13, 1987.

Frank Silvestri, New Orleans, La., for Ramirez.

Bruce G. Whittaker, New Orleans, La., for Valencia.

John H. Craft, New Orleans, La., for Rodriguez.

Cynthia Hawkins, Asst. U.S. Atty., John P. Volz, U.S. Atty., Harry W. McSherry, Jr., Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before VAN GRAAFEILAND *, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants, Luis Ramirez, Leopoldo Alegria-Valencia, and Antonio G. Rodriguez were convicted following a jury trial for various violations of the Federal Controlled Substances Act. Alegria, and possibly Rodriguez, challenge the Drug Enforcement Agency's ("DEA") search of luggage and other items which were left in an abandoned hotel room. Ramirez urges that a *Brady* [1] violation occurred. All three appellants question the sufficiency of the evidence and the failure of the district court to give certain jury instructions. We affirm.

Gabriel Quadri, a paid government informant, was approached by two Colombians who planned to smuggle a large amount of cocaine into the United States. Shortly afterward, in November, 1985, two of the Colombians' contacts, "Beto" and "Paco",

---

* Circuit Judge of the Second Circuit, sitting by designation.

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

met Quadri in New Orleans to arrange for the delivery of the cocaine from the M/V TUXPAN, docked in Gramercy, Louisiana. Quadri agreed to drive Paco and three of his confederates, Alegria, Rodriguez, and Jose Tapia, to Gramercy to retrieve the contraband.

Quadri testified that during the 35 to 40 minute trip, everyone in the car discussed the off-loading of the cocaine. Upon reaching Gramercy, Quadri dropped off Beto, Paco, and Alegria and proceeded to the TUXPAN with Rodriguez and Tapia, where they received a portion of the cocaine.[2] The trio returned to Gramercy, picked up Beto, Paco, and Alegria and headed for New Orleans. Moments later, their vehicle was stopped by government agents, the occupants were searched, and six packages of cocaine were found secreted on the persons of Rodriguez and Tapia and lying in the car. Cash in the amount of $14,500 was recovered from Paco.

The sting was not yet complete. Following the arrest, two agents, Gonzales and Stein, took the $14,500 found on Paco and returned with Quadri to the TUXPAN intending to purchase more cocaine from crewmember Gomez. The three men negotiated the purchase in Gomez's cabin. Agent Gonzales placed the cash on a table, but ostensibly because of his limited education, Gomez refused to count it. Gomez left the cabin and retrieved fellow crewmember Ramirez who Gomez said would count the money. As Ramirez attempted to leave the cabin with the money, Gonzales stopped him and insisted upon seeing the merchandise. Ramirez then turned to Gomez and instructed him to show Gonzales the cocaine. Gomez gave Quadri several packages of cocaine. As Quadri left the vessel, the agents arrested Ramirez and Gomez.

Meanwhile, another government agent, Mark Greenlee, went to the Rodeway Inn in Kenner where several of the defendants had been staying. According to the hotel manager, Room 220 was registered under Alegria's name through noon of the next day (November 26, 1985). Greenlee stayed and watched the room. Having observed no activity, he left at approximately 2:00 a.m. the next day and returned at 8:00 a.m. During Greenlee's absence, the manager had seen no one return to Room 220. Greenlee told the manager that if the room were later determined to be abandoned, he (Greenlee) would like to view any personal property.

Not surprisingly, no one returned to the hotel room, the rental period expired, and the manager began to ready the room for new occupants. Following his usual procedure, the manager examined the property in the abandoned room and the next day, November 27, he requested Greenlee to assume custody of the property. Among the items Greenlee recovered from the hotel room were several suitcases containing money, used airline ticket stubs bearing the names of Rodriguez and Alegria, and a boarding pass bearing the name of Alegria. An address book containing the names and telephone numbers of Quadri and of other coconspirators and the name of the TUXPAN, was found lying on a table in Room 220.

Except for the three appellants, all coconspirators pleaded guilty to the drug offenses for which they were charged. The jury found all three guilty of various offenses related to conspiracy or possession with intent to distribute cocaine or importation of cocaine.

**I.**

Alegria challenges the denial of his motion to suppress evidence obtained from the search of Room 220 at the Rodeway Inn. Although Rodriguez adopted the briefs of his co-defendants by letter instead of submitting a separate brief, it is not certain whether he participates in appeal of this claim. Nevertheless, because Rodriguez apparently shared Room 220 with Alegria

---

**2.** This was Quadri's second meeting on the TUXPAN. Earlier in the day crewmember Gomez, who was evidently responsible for the delivery, met Tapia and Quadri there and instructed them to return later that evening.

and because Rodriguez's counsel orally joined the motion to suppress in the trial court, we will address this issue with regard to Alegria and Rodriguez.

For fourth amendment purposes, it is necessary to analyze the search of the room and the inspection of the personal property separately. Regarding the room search, Alegria argues that the DEA, having waited for the rental period to expire instead of securing a search warrant, improperly exploited an exception to the exclusionary rule. Appellants explicitly acknowledge the "well-settled rule that a guest in a hotel or motel loses his reasonable expectation of privacy and consequently any standing to object to 'an unauthorized seizure of the premises' after his rental period has terminated." *United States v. Jackson*, 585 F.2d 653, 658 (4th Cir.1978), quoting *United States v. Parizo*, 514 F.2d 52, 54–55 (2d Cir.1975).[3]

█ Citing *United States v. Dowell*, 724 F.2d 599 (7th Cir.1984), appellants analogize Agent Greenlee's conduct to a situation in which law enforcement officials deliberately wait for exigent circumstances to arise before conducting a warrantless search and seizure. This argument is as ingenious as it is erroneous. While *Dowell* implies that such conduct might render illegal a search and seizure otherwise justifiable by reference to exigent circumstances, its statements to that effect constitute sheer *dicta*.[4] The *dicta*, are, moreover, contrary to the controlling law of this circuit found in *United States v. Mitchell*, 538 F.2d 1230 (5th Cir.1976) (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977). In *Mitchell*, this court held that even if government agents had time to obtain a warrant to search a vehicle, their failure to do so did not taint a search and seizure which was justified at the time of its conduct by the exigent circumstances exception. Appellants' proposed "exploitation" argument is fully refuted by the holding of *Mitchell:*

> We deal here with a crime and a criminal, not with a sporting event. True, the constable put himself in the way to blunder, though he did not. Appellant would nevertheless have us disqualify him from the game because he chose a course less than the best, or perhaps because his heart was not entirely pure. But it was not a game, and we decline to do so.

*Id.* at 1233–34.

█ Because the hotel room was abandoned, appellants had forfeited their reasonable expectation of privacy in it, and a search by the hotel manager did not trespass on appellants' fourth amendment rights. An equally compelling refutation of appellants' position, as will be discussed below, is that the hotel manager was not acting in the capacity of a government agent, and his independent conduct implicated no fourth amendment concerns.

█ Appellants purport to assert nevertheless a reasonable expectation of privacy

---

3. Federal courts of appeals have uniformly approved warrantless searches of hotel or motel rooms after occupancy has terminated. *United States v. Lee*, 700 F.2d 424, 425–26 (10th Cir. 1983); *United States v. Akin*, 562 F.2d 459, 464 (7th Cir.1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *United States v. Haddad*, 558 F.2d 968, 975 (9th Cir.1977). *See Able v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Savage*, 564 F.2d 728, 733 (5th Cir.1977). Appellants do not argue, nor does it make any difference to the outcome of their position, that their arrest constituted an involuntary relinquishment of control over the hotel room that would maintain any previously held expectations of privacy. *See United States v. Haddad*, 558 F.2d 968, 975 (9th Cir.1977); *United States v. Croft*, 429 F.2d 884, 887 (10th Cir.1970).

4. The court in *Dowell* stated, "[a]ppellants do not claim, and we do not find that the DEA deliberately ... exploited the exigent circumstances exception." 724 F.2d at 603. *Dowell* affirmed a conviction based on evidence obtained in the course of a warrantless entry under exigent circumstances. *Dowell* cites one case, *United States v. Berkwitt*, 619 F.2d 649, 654 (7th Cir.1980), to support its dictum concerning exploitation of the exigent circumstances doctrine. *Berkwitt* does not discuss the constitutionality of such a procedure, but, citing *United States v. Mitchell*, 538 F.2d 1230 (5th Cir.1976) (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977), finds only that there was no deliberate or unreasonable delay by government agents on the facts before it.

in the address book and luggage which were obtained and searched by the hotel manager before he delivered them to the government. Their contention is fundamentally flawed by the fact that neither appellant has asserted ownership of the address book or luggage. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Even if we assume that the airline ticket papers bearing the names of Rodriguez and Alegria were appellants' property, they may not assert that the search or seizure of the luggage which contained the papers was constitutionally infirm. The Supreme Court held in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), that a defendant had no legitimate expectation of privacy in a friend's purse where he had stored illegal drugs. *Rawlings* undertook a careful analysis of the facts to determine whether the defendant could appropriately seek shelter within the fourth amendment. The analysis here is, by contrast, perfunctory and the result foreordained because Alegria and Rodriguez established no facts at the suppression hearing concerning ownership of the luggage or the terms under which their ticket stubs were placed in it. *See also U.S. v. Strmel,* 744 F.2d 1086, 1088–89 (5th Cir.1984); *United States v. Renton,* 700 F.2d 154, 160–61 (5th Cir. 1983). *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), cited by appellants, is inapposite. In that case, the closed luggage was unquestionably owned by and in the possession of the defendant when it was searched.

■ Equally undermining appellants' contention that they are entitled to fourth amendment protection is the fact that the room was searched and the luggage seized and inspected initially by a private party, the hotel manager. The fourth amendment applies only to actions of the government. When evidence is retrieved by a private individual, it may be admitted at a criminal trial. *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). As appellants might contend, however, a search conducted by a private individual who acted as an "instrument or agent" of the state could violate the fourth amendment. *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). This court has recently held that "where the government has offered no form of compensation ..., did not initiate the idea that [the private party] would conduct a search, and lacked specific knowledge that [he] intended a search, ..." the private party was not an "instrument or agent" of the government. *United States v. Bazan,* 807 F.2d 1200, 1204 (5th Cir.1986). *Compare U.S. v. Miller,* 688 F.2d 652, 657 (9th Cir.1982). *Bazan* forecloses considering the Rodeway Inn manager an "instrument or agent" of the government in this case. DEA Agent Greenlee requested the manager's permission to view any property found in Room 220 once it was abandoned. The manager was neither compensated for nor instructed by the DEA to seize and search the personal property in the room. The government had no specific knowledge that the manager would inspect the luggage although the agent probably understood that the manager would exercise the hotel's prerogative to enter Room 220 and remove abandoned property before re-renting the room. There is no evidence that the government contrived circumstances whereby a thorough search would be conducted by the hotel manager for the purpose of avoiding fourth amendment requirements.

## II.

Ramirez argues that the government withheld material potentially valuable to the defense, consisting of a dock log which allegedly showed Ramirez away from the vessel at the time Quadri made his second visit to the TUXPAN to pick up the first

installment of cocaine.[5] Ramirez argues that he was prejudiced by this alleged *Brady* violation since he could neither cross-examine and impeach informant Quadri with the log nor call to testify as witnesses the crewmembers listed on the log as accompanying him ashore.

The government denies that a *Brady* violation ever occurred since: (1) Ramirez's signature was illegible and the government therefore had no idea that the list was of value to Ramirez; (2) all defendants were given the opportunity to inspect and copy all the documents the government intended to use at trial; and (3) Ramirez was given the dock log before he put on his case at trial and it was introduced as a defense exhibit. The government's position is correct for several reasons.

■ *Brady* involved "the discovery, after trial of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The Government avowedly knew nothing of the log's value to Ramirez, and even defense counsel agrees with the government's statement. By contrast, Ramirez either knew or should have known of the log and its value to his defense, and in such a case, the prosecutor is not obliged under *Brady* to furnish the disputed information. *United States v. Prior*, 546 F.2d 1254, 1259 (5th Cir.1977). Even if Ramirez did not remember the log, a *Brady* violation does not arise if, with reasonable diligence, Ramirez could have obtained the information. *Id.* Ramirez's counsel does not contest that he failed to take advantage of the government's pretrial proffer of all its documents to the defense counsel for inspection and copying.

■ Notwithstanding that the prosecutor had no duty to disclose evidence about which the defendant knew or should have known, there is no requirement of pre-trial disclosure of *Brady* material. *See United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978), *cert. denied* 440 U.S. 947, 99

S.Ct. 1426, 59 L.Ed.2d 636 (1979). Ramirez learned about the dock log as early in the trial as the testimony of the second witness, Agent Ware. Instead of demanding immediate disclosure of the evidence, Ramirez's counsel delayed until several more witnesses had testified. His counsel used the log to cross-examine Agent Ware. Contrary to his allegations, had defense counsel desired, he could have recalled informant Quadri to the stand and attempted to impeach his credibility using the log. Ramirez requested neither a continuance nor recess for the purpose of locating the potential alibi witnesses.

In any event, the log only tended to negate Ramirez's presence at the second meeting between Quadri and Gomez. It did not explain his presence at nor excuse his participation in that meeting which ultimately resulted in his arrest—the meeting among Gomez, Agents Gonzalez and Stein, Quadri and Ramirez where he instructed Gomez to display the cocaine. In summary, we find no *Brady* violation in the events of this case.

### III.

■ The discussion of the jury charge was not transcribed. One of the counsel's proposed instructions would have cautioned the jury against drawing any adverse inferences from the failure of Rodriguez and Alegria to testify. Counsel for Ramirez, in turn, requested an instruction which would caution jurors against drawing an adverse inference from the fact that *he chose to testify* on his own behalf. The district judge and defense attorneys recognized and discussed the potential fifth amendment issue inherent in the court's highlighting the fact that two defendants chose to testify while one did not. According to their brief, the defense attorneys left this conference thinking instructions would be given with respect to both situations. The court apparently recollected the discussion differently and, believing that counsel decided against instructions on the failure to testify, omitted any from its charge. None

---

5. See *infra* note 8.

of the defense attorneys objected on the record to the absence of the adverse inference instruction, but all three appellants now challenge the court's failure to include it.[6]

Appellants' failure properly to preserve error to this portion of the charge requires us to review the alleged deficiency for plain error. Fed.R.Crim.P. 52(b). Plain error is that error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *United States v. Graves,* 669 F.2d 964, 971 (5th Cir.1982). Although omission of the adverse inference instruction is an error of constitutional dimension to defendants Rodriguez and Alegria, *Carter v. Kentucky,* 450 U.S. 288, 299–300, 101 S.Ct. 1112, 1118–19, 67 L.Ed.2d 241 (1981), we are not prepared to say that under the facts of this case it constituted plain error. The trial court also had to struggle with the effect of this instruction upon Ramirez, who chose to testify in his own behalf, and the trial court believed that defense counsel had jointly withdrawn the requested instructions. In any event, an error that, if properly preserved, would withstand scrutiny under the "harmless beyond a reasonable doubt" test cannot be plainly erroneous.

This circuit has held that the omission of an adverse inference instruction, over proper defense objection, may be found harmless beyond a reasonable doubt. *Richardson v. Lucas,* 741 F.2d 753, 755 (5th Cir. 1984); *United States v. Eiland,* 741 F.2d 738, 742 (5th Cir.1984). To be harmless beyond a reasonable doubt, the evidence must, in spite of the error, be such as to overwhelmingly establish the guilt of the accused beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The evidence against these appellants, reviewed herein, was overwhelming. We conclude that they would have been found guilty beyond reasonable doubt even had the requested instructions been delivered by the court.

■ Ramirez raises two other objections to the jury charge. First, he contests the adequacy of its instruction on the weight to be given the testimony of a paid informant. A court does not err by refusing to use the exact words of a requested instruction as long as the charge, when viewed as a whole, correctly reflects the issues and law of the case. *United States v. Garza,* 754 F.2d 1202, 1210 (5th Cir. 1985). Ramirez's proposed charge with respect to the credibility of informant testimony adds nothing of consequence to the charge that was actually given by the trial court.[7]

■ Second, Ramirez unsuccessfully sought an instruction directing that additional consideration be given the Gomez and Tapia testimony which involved an admission against their interests; in other words, by testifying as they did, Gomez and Tapia had nothing to gain but much to lose from any adverse impact their testimony might have had on their plea bargains. The trial court refused to so instruct the jury, as he believed the charge given with respect to the credibility of informants included an instruction as to the general credibility of witnesses. The proposed charge does overlap other portions of the

---

6. Ramirez, who testified, has no standing to assert this error which pertains only to the non-testifying appellants.

7. The trial court instructed the jury as follows:
   [A] Paid informant or a witness who has been promised that he or she will not be charged or prosecuted or witnesses [sic] that hope to gain more favorable treatment in his or her own case, may have a reason to make a false statement because he wants to strike a good bargain with the government. So, while a witness of that kind may be entirely truthful when testifying, you should consider that [sic] testimony with more caution than the testimony of the other witnesses.

   Ramirez's proposed charge read as follows:
   You are instructed that you should scrutinize the testimony of an informer or paid agent of the government with great care before accepting that testimony as true, particularly where any agent's or informant's testimony is essentially uncorroborated by other competent or credible evidence.

court's instructions. Moreover, not only did Ramirez's attorney fail to object to this ruling, he agreed to it. There is no plain error in the charge on this account, nor any other error.

### IV.

The appellants challenge the sufficiency of the evidence on which they were convicted. The jury's verdict will be sustained if it is supported by substantial evidence when examined in a light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Eiland,* 741 F.2d 738, 741 (5th Cir.1984). We find no significant sufficiency issue pertaining to any of the defendants. Alegria argues that the evidence did not demonstrate an agreement or combination by him with other parties to possess or distribute cocaine. Contrary to his position, Alegria and codefendant Rodriguez flew from California to New Orleans together on the same plane, and both checked into Room 220 at the Rodeway Inn. Quadri returned a telephone call to Paco, one of the conspiratorial ringleaders, at Room 220, and Alegria answered and identified himself before handing the phone to Paco. Alegria participated in the conversation concerning cocaine while Quadri and the coconspirators were en route to Gramercy. Finally, ownership of the address book containing names and phone numbers of the principal characters involved in this conspiracy was linked to Alegria, although not claimed by him for purposes of the motion to suppress. Rodriguez is condemned by the evidence just recited and because two packages of cocaine were found taped to his body at the time of the arrest.

Concerning Ramirez, Quadri and DEA Agent Gonzalez both testified that when they went to the TUXPAN to make their

final deal with crewmember Gomez, Ramirez instructed Gomez to show them the cocaine and counted the cash payment. Ramirez objects that the testimony conflicted concerning his involvement in this drug transaction. Notwithstanding a dispute about how many meetings Ramirez attended on the TUXPAN,[8] both Quadri and Agent Gonzales identified him as an active participant in the third and final meeting of the "sting." The jury was fully equipped to determine the witnesses' credibility and its verdict must be upheld because the testimony relied upon is not incredible or insubstantial on its face. *United States v. Blankenship,* 746 F.2d 233, 241 (5th Cir. 1984).

For the reasons set out above, we find no reversible error and AFFIRM the judgments of the district court.

---

8. Quadri testified that Ramirez was present at and participated in three meetings held with Gomez. The first meeting occurred the morning of the arrest. This meeting lasted no longer than one-half hour to discuss the off-loading of the cocaine. Quadri also testified that Ramirez was present when he, Rodriguez, and Tapia arrived that evening to pick up a portion of the cocaine. The dock's log, however, showed Ramirez absent from the TUXPAN during the second meeting. Both Gomez and Tapia testified that Ramirez was neither present nor involved in either of these two meetings.