**STATE of Missouri, Respondent,**

v.

**Randy MITCHELL, Appellant.**

**No. WD 56872.**

Missouri Court of Appeals,
Western District.

June 20, 2000.

James R. Hobbs, W. Brian Gaddy, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before Presiding Judge LAURA DENVIR STITH, Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

Defendant–Appellant, Randy Mitchell, was convicted after a bench trial of manufacturing a controlled substance. This conviction was based on evidence seized during a search of his residence on July 8, 1998. He was also convicted of attempting to manufacture a controlled substance. This conviction was based on evidence seized during a subsequent search of his motel room on July 13, 1998. He was sentenced as a prior and persistent offender to concurrent terms of 12 years imprisonment for each count.

Mr. Mitchell argues that the evidence obtained during the July 8, 1998 search should have been suppressed because the affidavit on which the search warrant for his residence was based failed: (1) to disclose the basis of a confidential informant's knowledge, (2) to specifically indicate how the informant had been reliable in the past, and (3) to indicate that the informant had a prior criminal record. In addition, he claims that, even if the affidavit and warrant were valid, the items seized by police exceeded the scope of evidence permitted to be seized by the warrant. With regard to the July 13, 1998 search, Mr. Mitchell challenges the right of police to have entered his motel room at the request of the motel's cleaning crew, and the subsequent use of the observations made during that entry in the affidavit on which the warrant to search the motel room was based. Because we find none of these claims have merit, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial: Sometime in 1997, Deputy Timothy Carr of the Pettis County Sheriff's Office began receiving information indicating Defendant's involvement in the manufacture and distribution of methamphetamine. This information came to Deputy Carr from various sources.

First, Sheriff Gary Starke of Pettis County communicated to Deputy Carr information received from Informant A in December 1996, that Defendant lived on a farm north of town and operated a painting business as a front to mask his illegal drug activity. Informant A also claimed that Defendant often moved the location of the business to avoid detection, took the methamphetamine he produced to Kansas City to exchange it for cocaine, and supplied methamphetamine to others known by the police to be involved in the production and sale of controlled substances.

Second, from late in 1997 to early in 1998, Trooper T.J. Stevens, a narcotics investigator with the Missouri Highway Patrol, received information from another person, Informant B, which he forwarded to Deputy Carr. Informant B stated that Defendant stored materials necessary for the manufacture of methamphetamine in a garage located on Lafayette Street between 13 th and 14 th Streets in Sedalia.

Third, another person, Informant C, told the police that Defendant had recently returned from a trip "up east" where he purchased a large amount of goods used in methamphetamine manufacturing. Additionally, Informant C stated that Defendant had produced the illegal drugs at various locations, including in a camper being pulled on the highway and in the garage on Lafayette Street mentioned above. After Sheriff Starke passed on this information to him, Deputy Carr was able to verify some of the information about Defendant. Deputy Carr also located the garage on 13 th Street at the place described by Informants B and C, and noticed a trailer parked behind the building.

In February 1998, an unnamed member of Defendant's family called Deputy Carr, expressing concern regarding Defendant's

drug use, his wife's drug use, and the environment in which their children were living. This person believed Defendant was manufacturing methamphetamine and storing material involved in that activity in a utility room off of his kitchen. The family member said the room was locked and Defendant did not allow anyone else to enter it. Finally, the same family member told Deputy Carr that one of Defendant's children had been attacked by a Rottweiler that Defendant kept in his home to protect his drug activities. A report filed with the Department of Family Services (DFS) on February 28, 1998, and obtained by Sheriff Starke, confirmed the reports of this family member regarding the attacks on Defendant's child. It showed that the child was bitten in the face by a Rottweiler at about the time indicated, but was not taken to seek medical treatment.

On the same day the DFS report was filed, Sheriff Starke, Deputy Carr, and a DFS case worker went to Defendant's house and confirmed that the child had been bitten in the face and had not been treated by medical professionals. While in the house, Deputy Carr observed stains on the kitchen floor that, based on his experience in law enforcement, he believed appeared to have been caused by iodine or a mixture of iodine and red phosphorous. In addition, Deputy Carr noticed a container of acetone. Acetone, like iodine and red phosphorous, is used in the ephedrine reduction method, which is part of the methamphetamine manufacturing process. The deputy also noticed an odor in the house that was similar to odors he had noticed while investigating other methamphetamine labs, and saw that a door off of the kitchen had been padlocked. Finally, during this visit, Deputy Carr observed a Rottweiler around the house and learned that it had come from the house of Frank Carrender, who was a friend of Defendant's. The deputy later learned that Mr. Carrender's house had been searched in September 1997, uncovering an extensive amount of material used in the manufacture of methamphetamine.

In June 1998, Deputy Carr became involved with Informant D, who indicated he was familiar with Defendant. He told the deputy that Defendant had produced methamphetamine and stored the components for such production at various locations, mostly in his house, his shop, and the 13th Street garage. Informant D also stated that Defendant went out of state for his supplies. Further, on July 6, 1998, the evening before Deputy Carr applied for the warrant, Informant D told Deputy Carr that Defendant just completed a "half-pound cook" at his home. According to Informant D, half of the methamphetamine produced there was intended to be sent to Kansas City and the other half to Sedalia. Informant D also named two people in Sedalia, known by Deputy Carr to be involved in methamphetamine trafficking, who would be receiving the methamphetamine. Lastly, Informant D alerted Deputy Carr that, within a day or two, Defendant would be starting another methamphetamine cook at either his house, the garage or the camper.

On July 7, 1998, Deputy Carr applied for and obtained a search warrant, and executed it the following day. The search resulted in the seizure of methamphetamine, other chemicals and various pieces of equipment used in the manufacture of methamphetamine including: new and used coffee filters, a pint measuring cup and a glass jar containing liquid from the freezer, acetone, ph papers, scales, Coleman fuel, a can of lye, electric skillets, an electric griddle, containers with hydrochloric and muriatic acid, zip lock baggies, and a table-top and a hand-held scanner. Defendant was arrested, but was released on bond.

Less than a week later, on July 13, 1998, the Sedalia Police Department received a call from a member of the staff at the Comfort Inn in Sedalia, who reported finding items relating to the manufacture of illicit drugs. Officer Jim Stetzenbach went to the scene to investigate the report.

Upon his arrival, management informed him that a trash bag had been found in the third floor snack room containing numerous pill bottles and two yellow plastic bottles that contained the gasoline antifreeze, "Heet." Officer Stetzenbach looked at the items and noticed that the pill bottles contained pseudoephrine. He was aware, based on his experience, that this compound was used in the manufacture of methamphetamine.

Officer Stetzenbach then looked at the hotel register and saw Defendant's name, recognizing it as the name of a person who had been arrested a few days earlier for the manufacture of methamphetamine. The register indicated Defendant had paid for a single night's stay, was residing on the second floor in Room 214, and was scheduled to leave at check-out time, 11:00 a.m. Officer Stetzenbach also checked the parking lot and found a red 1989 Chevrolet Blazer, and determined that it was registered to Defendant's wife. Based on this information, Officer Stetzenbach, and his partner, Geoff Jones, decided to set up surveillance of the room. At that time, a motel housekeeper informed the officers that four cardboard boxes with dividers had been found behind the Coke machine in the second floor snack room. These boxes appeared to have been used for packing pill bottles.

Defendant called the front desk to "advise they were going to be late checking out," indicating he and his wife had overslept. Nothing in the record indicates whether the motel's management agreed to a late check-out, or, if so, how late they could be. At approximately 11:20 a.m., Defendant and his wife exited their room, closing the door behind them. Mrs. Mitchell was carrying a number of bags and Defendant was carrying a duffel bag and a cardboard box, larger than the type of box found behind the Coke machine. Officer Stetzenbach thought they had all their things with them. He and Officer Jones stopped the Mitchells, read them their Miranda rights, and asked for con-sent to search the motel room. Both Mrs. Mitchell and Defendant refused to grant the officers consent to search their room. The officers decided they would obtain a search warrant for the Mitchells' bags and car and detained the Mitchells in the interim by taking them to a more secure location, a conference room at the hotel. In walking to that location, Officer Stetzenbach heard the sound of glass containers clinking together, and he believed the sound was coming from Defendant's bag. He also was able to see coffee filters and several clear plastic bags with white pills in them through the mesh pockets on the exterior of Defendant's duffel bag. These looked like materials used in the manufacture of methamphetamine.

One half-hour or so after the Defendant and his wife were stopped, and while waiting for a warrant, Defendant and his wife were taken into custody and transported to police headquarters. Also, while Officer Stetzenbach was waiting for the warrant, members of the motel's cleaning staff asked the police whether they could clean the room and Officer Stetzenbach said he "didn't see why not." He later said he was unaware that the Mitchells had left personal items in the room at that time. One reasonable reading of Officer Jones' testimony is that this occurred after Officer Jones had placed the Mitchells in custody and transported them to police headquarters, although his testimony is somewhat confusing on this point. In any event, soon thereafter, someone from the motel's management told Officer Stetzenbach that while cleaning Room 214, the cleaning crew came across some items that they wanted to show the officers. Officer Stetzenbach followed this person to the room, took a couple of steps into the room, and saw glass-baking dishes with white powder residue on the counter, two griddle boxes, and some of the Mitchells' personal items. The officer then realized that the Mitchells had left things in the room, and exited the room without conducting a search, other than what he saw in plain view.

Officer Stetzenbach included information he saw in his view of the room, as well as other information about Defendant and about the other items already found at the motel, in his affidavit supporting the warrant to search Room 214. A warrant was obtained and a search pursuant to that warrant ensued. The search resulted in the seizure of a number of items, similar to those described in the affidavit and to those seized from Defendant's house a week earlier.

As a result of the evidence seized from the July 8, 1998 search, Defendant was charged with manufacture of a controlled substance in violation of Section 195.211, and possession of a controlled substance in violation of Section 195.202. As a result of the evidence seized from the July 13, 1998, search, Defendant was charged with attempt to manufacture a controlled substance in violation of Section 195.211, and possession of pseudoephedrine with the intent to manufacture methamphetamine in violation of Section 195.246. After a bench trial, Defendant was found guilty of manufacturing methamphetamine sometime between June 1 and July 8, 1998, and of attempting to manufacture methamphetamine at the Comfort Inn on July 13, 1998. He was sentenced as a prior and persistent offender to concurrent terms of 12 years imprisonment. This appeal followed.

## II. STANDARD OF REVIEW

In reviewing a trial court's denial of a motion to suppress, we look only to whether the evidence from the record was sufficient to support the ruling and do not substitute our judgment for that of the trial court. *State v. Burkhardt,* 795 S.W.2d 399, 404 (Mo. banc 1990); *State v. Milliorn,* 794 S.W.2d 181, 184 (Mo. banc 1990). Indeed, we will reverse a ruling on a motion to suppress only if it is clearly erroneous. *State v. Logan,* 914 S.W.2d 806, 808 (Mo.App. W.D.1995). "The weight of the evidence and the credibility of the witnesses is for the trial court's determination," *Burkhardt,* 795 S.W.2d at

404, *see also State v. Childress,* 828 S.W.2d 935, 939 (Mo.App. S.D.1992), and "[a]ll facts are viewed in the light most favorable to the ruling; contrary inferences are disregarded." *Logan,* 914 S.W.2d at 808.

## III. THE SEARCH OF DEFENDANT'S HOME WAS PROPER

In his first point, Defendant claims that the search warrant obtained for the July 8, 1998, search of his home issued without sufficient probable cause for three reasons, which we address in turn.

First, Defendant claims that the affidavit was inadequate because it failed to state the basis of Informant D's knowledge about Defendant's manufacture of illegal drugs. Therefore, Defendant asserts, we cannot know whether the informant's information was based on the informant's observations, or whether it was merely hearsay or even a mere fabrication. The absence of information regarding the source of the informant's knowledge, Defendant contends, renders the warrant lacking in probable cause.

We disagree. While it may be desirable that an affidavit provide information as to the source of an informant's knowledge, the failure to recite such information does not render the affidavit inadequate to support issuance of a warrant. To the contrary, it is well-established that probable cause is established by looking at the totality of the circumstances surrounding the warrant, *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983); *State v. Dawson,* 985 S.W.2d 941, 949 (Mo.App. W.D.1999); *State v. Miller,* 815 S.W.2d 28, 31–2 (Mo. App. E.D.1991), not by judging a particular informant's information separately and independently from other information obtained by law enforcement.

For this reason, and as many courts have previously noted, corroboration through other sources is often sufficient to provide a substantial basis for believing the informant's statements, even

in the absence of detailed information about where the informant obtained his knowledge about Defendant. *See, e.g., Dawson,* 985 S.W.2d at 949; *United States v. LaMorie,* 100 F.3d 547, 553 (8th Cir. 1996). We have previously held that "[t]he concepts of 'veracity,' 'reliability,' and 'basis of knowledge' are relevant considerations but they are not entirely separate and independent requirements to be rigidly applied in every case." *State v. Hill,* 854 S.W.2d 814, 817 (Mo.App.1993), *citing, Gates,* 462 U.S. at 230, 103 S.Ct. at 2328, 76 L.Ed.2d at 543. Indeed, "[c]orroboration from other witnesses and from independent observations of police officers creates a substantial basis for crediting hearsay statements in an affidavit." *Dawson,* 985 S.W.2d at 950. *See also State v. Williams,* 937 S.W.2d 330, 332 (Mo.App. E.D.1996).

Defendant's argument ignores these principles, and concentrates almost entirely on the lack of recitation in the affidavit of the basis for Informant D's knowledge. This sort of narrow approach to examination of the sufficiency of an affidavit in support of a search warrant was rejected in the cases cited. For instance, in *LaMorie,* a warrant was held valid where the police partly based their affidavit on information provided by an informant who was one of the participants in the crime that the police were investigating. The court found this sufficient where, "officials were already aware of the crime and had been investigating it for some time." *LaMorie,* 100 F.3d at 554. *See also Dawson,* 985 S.W.2d 941, 949 (warrant proper even though informant was anonymous, where the "affidavits relied upon various sources of information ... [and informant's statements] were corroborated by the acts observed by police officers investigating this crime").

■ Similarly, here, Informant D appeared late in the chronology of Deputy Carr's investigation. Much of the basis for the search had already been established based on the reports from other officers and Deputy Carr's own observations of the garage and during his visit to the house with DFS. Other information was provided by Informants A, B and C and by Defendant's own relative. As we noted in *State v. Williams,* it is appropriate to include information about prior criminal activity such as that reported by the earlier informants in considering "whether there was a fair probability that the appellant was engaging presently in such activity." *State v. Williams,* 9 S.W.3d 3, 17 (Mo.App. W.D. 1999). Here, the information provided by the other informants and by Deputy Carr was sufficient to validate the information provided by Informant D, even without further details about how Informant D obtained his information.

■ Defendant also claims that the affidavit was inadequate because it failed to specifically explain how Informant D had been found reliable in the past. The affidavit did, however, state that Informant D had provided reliable information in the past. Contrary to Defendant's arguments, our Supreme Court has held that a general statement that the informant has been reliable in the past is sufficient, and that it is not necessary for the affidavit to set out more specifically what type of reliable information the informant has previously provided in order "for the magistrate to gauge independently the reliability of the informer." *State v. Laws,* 801 S.W.2d 68, 69 (Mo. banc 1990). As *Laws* noted, numerous cases have taken this approach and approved the issuance of a warrant in circumstances similar to the case at bar:

In *State v. Hall,* 687 S.W.2d 924, 928–29 (Mo.App.1985), an officer stated that the informant, who had previously provided reliable information, reported witnessing a drug sale at the defendant's residence. This was bolstered by the officer's knowledge that the defendant had been associated with narcotics and arrested for felony possession of marijuana. In *State v. Weber,* 768 S.W.2d 645, 649 (Mo. App.1989), one affiant stated a source who had given him reliable information

in the past said he witnessed a cocaine purchase at defendant's residence, and another affiant stated that a different informant told him he had seen cocaine in the defendant's home. The affidavit also stated that neighbors noticed numerous cars coming to defendant's residence but the visitors stayed only a short time. This was found sufficient to support a finding of probable cause.

Similarly, in *State v. Sargent,* 702 S.W.2d 877, 881–82 (Mo.App.1985), the informant's statement that she observed marijuana in defendant's residence was corroborated by police surveillance establishing that two known drug users visited the residence and remained only a short period of time. Further, one officer stated that a reliable source reported drug sales and usage on the property. Finally, in *State v. Luleff,* 729 S.W.2d 530, 533–34 (Mo.App.1987), the search warrant was predicated merely on the defendant's wife's statement that there was cocaine in the home. There was no corroboration of any kind on the face of the affidavit, although police knew the defendant as a drug dealer and were further aware that his wife had a criminal record for sale of a controlled substance.

*Laws,* 801 S.W.2d at 70.

■ For this reason, "[w]hen an informant's information is at least partly corroborated, as it was in the instant case, 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" *United States v. Gladney,* 48 F.3d 309, 313 (8th Cir.1995). Here, Deputy Carr's statement in the affidavit that Informant had provided reliable information in the past was sufficient. The affidavit was not required to contain the additional specificity Defendant demands.

■ Lastly, Defendant claims that Deputy Carr's affidavit was inadequate because it failed to inform the judge that Informant D had a prior criminal record and had pending charges against him. Defendant does not contend that this was part of an intentional effort to mislead the judge, and in fact the deputy's testimony at the suppression hearing revealed that this was simply not information which he normally included in an affidavit in support of a search warrant, and he did not believe that he was required to do so. Defendant argues, rather, that a judge must know whether an informant has a criminal record or has criminal charges pending against him or her in order to properly evaluate the credibility of the informant. The State argues that such information is not required.

In *State v. Weide,* 812 S.W.2d 866, 871 (Mo.App. W.D.1991), we addressed a somewhat similar situation. There, defendant argued that his motion to suppress should have been granted because the affidavit which formed the basis for the warrant failed to reveal that the informant was under arrest at the time he provided the information about defendant, and had been told that if he cooperated no charges would be filed against him. We noted that numerous federal cases had addressed the issue whether the results of a search warrant should be suppressed if the judge who issued it was misled by false information. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (two-step inquiry would be conducted where it was alleged that police deliberately misled magistrate by providing false information, looking at first, whether there was an intent to mislead, and, second, whether the warrant would have issued without the misleading information).

*Weide* noted that, at that point, no Missouri court had addressed whether principles governing the obligation not to mislead the magistrate were applicable where it was alleged that police failed to inform the magistrate that their informant was under arrest when he gave the information and would benefit by cooperating. We noted, however, that the Eighth Circuit had held in *United States v. Reivich,* 793 F.2d 957 (8th Cir.1986), that deliberate

omissions in an affidavit provide a basis to challenge a search warrant where the defendant shows "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, [citations omitted]; and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." 793 F.2d at 961, *quoted in, Weide,* 812 S.W.2d at 870.

We found this approach applicable in *Weide* but held that, absent evidence that the information about the informant's criminal charges had been deliberately suppressed in order to mislead, "a failure to advise the court of payments to an affiant or promises of leniency do not constitute material omissions of fact sufficient to defeat a search warrant." *Id.* at 871.

This approach is consistent with that taken by a number of federal courts in considering whether an affidavit must inform the magistrate about the informant's criminal history. While some federal cases cited by the parties note that it is better to provide information about an informant's criminal past, or to at least disclose that the informant may have been involved in the criminal activity he is informing about, such information is not required in order to avoid misleading the magistrate. Indeed, other cases have noted that most informants could not obtain the information they have about a criminal activity unless they were involved in it. A magistrate will often assume that the informant was involved, and that this is how the information was acquired. The magistrate is thus not misled by the failure to mention the informant's criminal history. As the Eighth Circuit stated in *United States v. Flagg,* 919 F.2d 499 (8th Cir. 1990):

> [E]ven if the confidential informant had a criminal record and was cooperating under a plea agreement, these facts are not clearly critical to the finding of probable cause. In *United States v. Parker,* this court recognized it is not necessary

to notify the Magistrate of an informant's criminal history if the informant's information is at least partly corroborated. [*United States v. Parker,* 836 F.2d 1080, 1083 (8th Cir.1987)] In the instant case, independent police investigation corroborated the information supplied by the confidential informant....

> *Furthermore, a magistrate generally would not be misled by the alleged omissions of facts in this case because informants frequently have criminal records and often supply information to the government pursuant to plea arrangements.*

*Id.* at 501 (emphasis added). Similarly, *United States v. Strifler* 851 F.2d 1197 (9th Cir.1988), stated:

> *Agent Davidson said nothing about the veracity of the source identified as a confidential informant. It would have to be a very naïve magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive.* The magistrate would naturally have assumed that the informant was not a disinterested citizen....

> Even on the assumptions that the defendants are correct and the assumedly inaccurate statements [in the affidavit] are rewritten, the magistrate had before him the affidavit of an experienced investigator indicating purchases of specific precursors by named individuals whose innocent use of them was controverted by an informant who knew these individuals had been doing "cooks" in March and who claimed to have smelled a "cook" a few days before he came to Davidson. The corrected affidavit would have supported the warrant.

*Id.* at 1201 (emphasis added). Finally, other courts have also found that such omissions are not material misrepresentations that would be "clearly critical" to the issuing judge. *Gladney,* 48 F.3d at 315.

These principles are directly applicable here. We find no evidence of an intent to

mislead, and do not find that the affidavit was misleading simply because it did not include information about Informant D's criminal background. It included information that Informant D knew about various drug buys and cooks by Defendant. The magistrate would know that such knowledge would seldom be innocently acquired.

Defendant also argues that some of the material seized in the July 8, 1998 search of his home unconstitutionally exceeded the scope of items permitted to be seized in the warrant. The warrant permitted the seizure of "any of the various chemicals used in the manufacture of methamphetamine" and "various items of drug paraphernalia as defined by statute." Specifically, Defendant challenges the seizure of the following items from his residence as being beyond the scope of the warrant: unused coffee filters, an electric skillet, an electric griddle, empty ziplock bags, pages from a telephone bill, a hand scanner, and a table top scanner. He claims that these items were not evidence and were seized improperly.

While it is true that these items were not specifically mentioned in the warrant, "items discovered in a search pursuant to a valid warrant may be seized if: (1) they are observed in plain view while the police officer is in a place where he has the right to be; (2) discovery is inadvertent; and (3) it is apparent to the officer that he has evidence before him." *State v. Wallace,* 825 S.W.2d 626, 630 (Mo.App. E.D. 1992).[1] *See also State v. Sumlin,* 782 S.W.2d 749, 754 (Mo.App. S.D.1989). There must be "a nexus automatically provided in the case of fruits, instrumentalities or contraband between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to

believe that the evidence sought will aid in a particular apprehension or conviction." *State v. Lee,* 617 S.W.2d 398, 400–01 (Mo. banc 1981), *citing, Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). In *Wallace,* the officers were in the defendant's bedroom searching in a chest of drawers in search of cocaine or drug paraphernalia when they found two short-barreled shot guns. Seizing the guns was not improper because the police had a right to be in the drawers pursuant to the warrant (as they could look in places where the items intended to be found can reasonably be hidden), the guns were in plain view, and it was apparent that the officers had evidence in front of them.

Here, the officers were validly searching in a place they had a right to be under their warrant when they saw the items seized in plain view, and there was a nexus between the items seized and criminal behavior. The unused coffee filters and ziplock bags are probative of criminal behavior in that these are used in the production and packaging of drugs, respectively, as is evidenced by the fact that Defendant does not contest the used coffee filters or bags. Similarly, skillets and griddles are also used in the manufacture of methamphetamine. In fact, Deputy Carr noted that one of the skillets had red stains indicative of chemicals used in the methamphetamine manufacturing process. It is also apparent that the officers had evidence before them when they seized the scanners that they are sometimes used by criminals to monitor police activity, thus aiding in the concealment of their operations. Moreover, with the exception of the pages of the telephone bill, all of these items fall into the statutory definition of "drug paraphernalia," [2] and drug paraphernalia was listed

---

1. The second requirement, inadvertence, is no longer required for a plain view seizure. *State v. Collins,* 816 S.W.2d 257, 261 (Mo. App.1991).

2. Under Section 195.010, drug paraphernalia includes:

all equipment, products and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, storing,

in the warrant. While it is clear that some of these items can also be personal items with personal uses, they can also have a nexus with criminal behavior, and were seized on that basis, in plain view, and thus the scope of the search was not impermissibly broad.[3]

## IV. THE MOTEL ROOM SEARCH WAS PROPER

Defendant's final point challenges the search of his motel room on July 13, 1998. He alleges that Officer Stetzenbach's initial entry into his motel room at the request of the motel cleaning crew was without a warrant, and was unconstitutional. He also argues that, without the information Officer Stetzenbach put in his affidavit based on what he saw in the motel room, the warrant would not have been issued. Thus, he argues, the search was invalid and its results must be suppressed.

■■■ Although the Fourth Amendment to the United States Constitution generally protects individuals from warrantless searches and seizures, before an individual can invoke these protections and successfully argue for the suppression of evidence obtained from such searches, he or she has the burden to show a legitimate expectation of privacy in the place or thing being searched. *State v. Thompson*, 820 S.W.2d 591, 593–94 (Mo.App. E.D.1991); *State v. Nichols*, 628 S.W.2d 732, 736–37 (Mo.App. S.D.1982); *United States v. Larson*, 760 F.2d 852, 854 (8 th Cir.1985). Unless a defendant meets that burden, he or she has no standing to contest a search of the place involved. *State v. Martin*, 892 S.W.2d 348, 351 (Mo.App. W.D.1995); *Nichols*, 628 S.W.2d at 736. *See also, United States v. Kitchens*, 114 F.3d 29, 31 (4 th Cir.1997), *citing, Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *United States v. Rahme*, 813 F.2d 31, 35 (2 nd Cir.1987); *United States v. Ramirez*, 810 F.2d 1338, 1341 (5 th Cir.1987). Here, Defendant claims that he met his burden of showing he had standing to contest the search of his motel room because he showed he had a reasonable expectation of privacy in that motel room, despite staying in the room past check-out time. We disagree.

■■■ Generally, a person who has rented a room in a motel holds a reasonable expectation of privacy in that room. *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *State v. Brasel*, 538 S.W.2d 325, 329 (Mo.1976); *State v. Collett*, 542 S.W.2d 783, 785 (Mo. banc 1976) (arrest warrant context). As long as that rental continues, a reasonable expectation of privacy exists and unless otherwise permitted by statute, not even a motel's employees or management can consent to a police request to search the room. *Id. See also, Rahme*, 813 F.2d at 34; *Ramirez*, 810 F.2d at 1341; *Akin*, 562 F.2d at 464; *United States v. Parizo*, 514 F.2d 52, 54 (2nd Cir.1975); *Unites States v. Croft*, 429 F.2d 884, 887 (10 th Cir.1970). The State and Defendant disagree here as to whether Defendant's reasonable expectation of privacy in his motel room had terminated at the time Officer Stetzenbach entered the room at the request of the motel's cleaning staff.

In a case similar to the case at bar, *U.S. v. Allen*, 106 F.3d 695, 697 (6 th Cir.1997), the defendant rented a room for a single night. The policy of the hotel required that he pay in advance for the room rental

---

containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance or an imitation controlled substance in violation of sections 195.005 to 195.425.
Sec. 195.010(18) RSMo 1994.

**3.** The police also seized a telephone bill which they saw in plain view while searching the house. While it is not clear from the record what about the bill showed it had a nexus to the criminal activity, Defendant does not maintain that it had no such nexus or that it was not in plain view, just that it was not mentioned in the warrant, and Defendant does not indicate how the bill itself was incriminating or how suppression of it would have had any effect on the State's case.

and also provide a deposit for telephone service. The defendant did so, and the next morning he paid for an additional night's rental but did not tender an additional deposit for telephone service. At 3 p.m. that afternoon, a hotel clerk noticed that the defendant had incurred telephone charges which reduced his credit to an amount insufficient to pay for the additional night of lodging. The clerk called the defendant to inform him of the shortage, and the defendant said that he would soon come and make up the difference. The defendant never did settle the matter and the clerk apprised the hotel manager of the situation. The manager went to the room, knocked, and when no one answered, entered with her pass-key. After noticing large quantities of illegal drugs in the room, she left, locked the door with a special lock that only staff of the hotel could open, and called the police. When the police arrived, she took them to the room and showed them the drugs prior to their obtaining a warrant. The defendant's arrest and conviction followed. *Allen*, 106 F.3d at 697.

The defendant in *Allen* later argued that the police violated his Fourth Amendment rights by failing to secure a warrant before entering his hotel room, but the court disagreed, finding that his privacy rights in the hotel room had be extinguished. *Id.* at 699. Specifically, the court found that, after the defendant's request to extend the time of his stay, he failed to pay the rent due on the room, and therefore, "[the defendant's] tenancy properly ceased, both because he was not allowed to store illegal drugs on the premises and because his pre-paid rental period had elapsed." *Id.* *See also, United States v. Huffhines*, 967 F.2d 314, 316 (9 th Cir.1992) (manager repossessed room and locked the guest out after rental period lapsed); *Rahme*, 813 F.2d at 33 (same); *United States v. Rambo*, 789 F.2d 1289 (8 th Cir.1986) (hotel employees asked the defendant to leave and called the police, ending his rental period and thus his right to privacy in the room).

In *Larson*, a woman rented a room for one night, paying in advance as required by hotel policy. She lodged there that night with the defendant, but the next morning checked out and received permission from the hotel's management for defendant to stay in the room until 2:00 p.m., although the normal checkout time was 12:00 noon. At 2:30 p.m. that day, the hotel's cleaning personnel came to the room and defendant stated that he was staying over and did not want the service. At 5:30 p.m., a bellman went to the room and found it was unoccupied. Management then went to the room, found illegal substances, and called police. When police arrived, management told them what they had found and then went to the room and knocked again. This time defendant was in the room and agreed to come down to take care of the rent. Soon thereafter, the police went to the room, and when defendant would not let them in, management granted the police permission to enter it. *Larson*, 760 F.2d at 854.

The court found that, although the hotel's management permitted defendant to stay past noon, this permission extended only until 2 p.m. Thus, because defendant had stayed beyond that period permitted by the rental period, and in this case the additional period permitted by the hotel, the court held that "[w]hen the rental period has elapsed, the guest has completely lost his right to use the room and any privacy associated with it." *Id.* at 855 (emphasis in original), *quoting, Parizo*, 514 F.2d at 54. *See also, Ramirez*, 810 F.2d at 1338 (officer was permitted to wait for the rental period to expire and then enter the room with the hotel's permission); *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115, 1118 (1993).

The rationale of these cases applies here. The motel in which Defendant was staying had a check-out time of 11:00 a.m. The record shows that Defendant called motel management and said he would be late checking out because he

overslept. It does not indicate that Defendant obtained management's permission to stay past 11 a.m., or that he asked to stay to any particular time of day. In the absence of evidence of motel permission to stay or of a prior pattern or practice of the motel of allowing guests to stay past check-out time, Defendant's reasonable expectation of privacy in the room ended at check-out time even if he and his possessions still remained in the room. The motel staff would have had a right to enter at any time to evict him or to prepare the room for the next guest. *Rahme*, 813 F.2d at 34 ("when a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles therein of which the hotel lawfully takes possession ... once the guest's access to the room is no longer his 'exclusive right,' he has no legitimate expectation of privacy in the room even though he himself still has access"); *Parizo*, 514 F.2d at 54 (manager of motel has right to enter room, consent to search of the room, and seize items found in the room when the term of a guest's occupancy expires); *Croft*, 429 F.2d at 887 (accord); *Kitchens*, 114 F.3d at 32 (noting that the failure of the hotel's management to maintain a pattern and practice in enforcing its check-out policy may give rise to an expectation of privacy in a guest who is permitted to repeatedly stay beyond the normal check-out time without tendering the next day's rent until later in the evening after the hotel's normal check-out time). It was Defendant's burden to prove that he had standing to contest the search by showing that his reasonable expectation of privacy in the room continued. In the absence of evidence from Defendant, the officers or motel management that the motel had agreed to extend the rental period or that the motel did so routinely, the court below had a sufficient basis to find that Mr. Mitchell had not met his burden of showing a continued privacy interest in the room at the time Officer Stetzenbach entered it. *Kitchens*, 114 F.3d at 32.

Even if we were to assume that the motel's management impliedly gave Defendant a limited period of extra time in which to gather his things, leave the room and check-out, the record nowhere suggests that he asked for permission to stay a second night or that he was granted an indefinite or lengthy extension of the prior night's rental. Rather, the facts showed he and his wife simply said they would be late since they overslept, and that they were carrying packed bags, apparently on their way to their car, when they were detained by the police at about 11:20 a.m. At that point, the police asked for permission to search the motel room, but the Mitchells refused to consent to the search, indicating that they had not yet checked out. However, Defendant's right to refuse others entry into the room could not continue indefinitely. It could continue only so long as motel management permitted them to remain in the room after check-out time, unless they were permitted to pay for an additional night's rental.

Here, it is clear that they did not pay for another night's rental of the room. In fact, they never even returned to the room or to the motel at all, and never formally checked out. Thus, we must look to the other facts to determine when motel management can be reasonably said to have reasserted its right of control over the room and to have terminated any limited privilege Defendant claims it granted him to check out late.

The record shows that, once Defendant and his wife were initially questioned, Officer Stetzenbach took them to another room to wait while he sought a warrant to examine their belongings. The officers testified that neither of the Mitchells indicated when they were detained that they still had some of their things in the room which they wanted to pack up, nor did they ask the police to safeguard anything in the room. Apparently, they simply left their other things in the room when they were detained.

Some time thereafter, most likely while Officer Jones was transporting the Mitchells to police headquarters, the motel cleaning staff asked the police whether they could clean the room. The judge could have concluded that, at this point, the Mitchells' right to use of the room had ended because the motel was reasserting its control over the room by entering it to clean it in preparation for a new guest. The only limitation the motel indicated it recognized on its right to undertake this cleaning was whether the police needed the room left as it was. They did not seek the Mitchells' permission to clean it, indicating that they believed that the Mitchells had no further interest in the room. Indeed, logically, the motel would have had no reason to clean the room for the next guest until it considered the Mitchells' rental of the room to have ended. At the point it entered the room to clean it for the next guest, the motel had thus necessarily terminated any temporary permission which it may have given Defendant to have some extra time to check out of the room because he overslept. For this reason, we conclude that the record supports the trial court's conclusion that the Defendant failed to meet his burden of showing that he had a reasonable expectation of privacy in the room at the time Officer Stetzenbach entered it at the request of the cleaning crew.

█ The fact that the Mitchells had not formally checked out by this point does not affect this determination. In fact, here, it is admitted that Defendant never checked out of the room, yet it could not reasonably be contended that he still has a privacy interest in the room. Rather, to the extent that it appears from Officer Jones' testimony that the Mitchells may have actually already been placed in custody and were on their way to headquarters at the time the cleaning crew asked Officer Stetzenbach to look at the room, it supports the conclusion that they had no privacy interest in the room. Numerous cases have held that, even if the reason a hotel guest has failed to pay for another night's lodging, or has left items in the room past check-out time, is that the guest was arrested, this is still considered a voluntary relinquishment of a privacy interest in the room which entitles the hotel personnel to enter and to permit police to do so also. The cases addressing this issue reason that this is not unfair, since it is the renter's own criminal conduct which has led to his being detained by police. Thus, as in the other cases just discussed, as the rental had ended, so had defendant's reasonable expectation of privacy. *Huffhines*, 967 F.2d at 318; *Rahme,* 813 F.2d at 35; *Ramirez*, 810 F.2d at 1341 n. 3; *Croft*, 429 F.2d at 887.

For example, in *Huffhines*, the hotel's assistant manager consented to a search by police of the defendant's room after the manager retook possession of the room for non-payment of rent. The defendant argue that his expectation of privacy in the room continued after the rental period expired because his arrest prevented him from returning to the motel to renew the rental. The Court found that the defendant could not rely on his own misconduct to extend his rental period. *Huffhines*, 967 F.2d at 318. Similarly, in *Rahme*, the defendant was arrested on February 20, 1986, at LaGuardia Airport after he consummated a drug transaction with an undercover officer. In searching the defendant incident to his arrest, the officers found a key to a room 418 at a hotel where the defendant had been staying. The next day, prior to any attempt by the officers to obtain evidence from·the room, the security manager at the hotel went to room 418 after no one had reserved or paid for another night in the room. Upon entering the room, the security manager noticed that some luggage remained in the room, left it untouched, and plugged the room's lock to ensure that no one would be able to enter the room without first contacting the hotel's management. The next day, because the hotel did not hear from room 418's last occupants, the security manager returned to the room with two maids. All

of the luggage, which included a bag containing the defendant's name, was removed from the room and placed in the hotel's storage area. Two days later, the officers contacted the hotel and obtained the luggage that had been removed from the room. *Rahme*, 813 F.2d at 33. Defendant claimed that he retained his expectation of privacy in the luggage because the arrest at the airport precluded him from returning to the room and extending the rental period. The court rejected this argument, finding that it was defendant's own conduct that prevented his return to the hotel. *Id.* at 35.

These cases are directly applicable here. We conclude that, in the absence of payment for continued rental of the room, or of permission to stay in the room more than the time reasonably considered a "late check-out," Defendant lost his privacy interest in the room when the motel took back possession of the room to clean it. At that point, Defendant no longer had a reasonable expectation of privacy in the room. As a result, he had no right to object when the cleaning staff, finding evidence of criminal activity in the room, came to the officers and asked them to come look at the room,[4] and as such cannot employ the protections of the Fourth Amendment to suppress evidence found in it. Accordingly, we find that Defendant failed to show, as it is his burden to do, that he had a reasonable expectation of privacy in the motel room at the time the officer entered it without a warrant.

Finally, we note that, even had we believed that Defendant's privacy interest in the motel room still existed at the time that Officer Stetzenbach entered the room and saw drug paraphernalia there, we would not be required to invalidate the search. The inclusion in the affidavit of the allegedly tainted information obtained by Officer Stetzenbach when he walked into the room at the request of the cleaning crew does not necessarily invalidate the warrant. In such a case, "the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *State v. Macke*, 594 S.W.2d 300, 308 (Mo.App. E.D.1980). *See also Brasel*, 538 S.W.2d at 330–31; *State v. Dudley*, 819 S.W.2d 51, 55 (Mo. App. S.D.1991). Without the officer's observations of the room obtained when he looked into it at the request of the cleaning crew, the other information in the affidavit was as follows:

1. Call from hotel reporting items found relating to the manufacture of illicit drugs.

2. Officer Jim Stetzenbach investigated call, management informed him of a trash bag found in the third floor snack room containing numerous pill bottles and two yellow plastic bottles that contained the gasoline antifreeze, "Heet." Officer Stetzenbach looked at the items and noticed that the pill bottles contained pseudoephrine, of which he was aware that, based on his experience, this compound was used in the manufacture of methamphetamine.

3. Defendant's name was in the hotel register and a car registered to his wife was in the parking lot.

4. Officer Stetzenbach was aware Defendant had recently been arrested for manufacture of methamphetamine.

5. Motel housekeeper informed the officers that four cardboard boxes with dividers had been found behind the Coke machine in the second floor snack room. These boxes appeared to have been used for packing pill bottles.

6. When, at 11:20 a.m., Defendant and his wife exited their room, Mrs. Mitchell was carrying a number of bags and Defendant was carrying a duffel bag and a cardboard box, larger than the type

---

4. There is no suggestion on this record that the police intentionally sent the cleaning crew into the room in an effort to avoid the need for a warrant. The only evidence is that it was the cleaning crew that indicated that they wanted to clean the room.

found behind the Coke machine. In walking to secure location, Officer Stetzenbach heard the sound of glass containers clinking together, and it seemed to be coming from Defendant's bag, which Defendant was handling very carefully. He also was able to see through the mesh pockets on the exterior of Defendant's duffel bag coffee filters and several clear plastic bags with white pills in them.

7. The assertions of the hotel's cleaning personnel that the police ought to look at what they saw in the room.

Considered alone, these facts were sufficient to form the requisite probable cause for issuance of a warrant to the search of the room. Accordingly, even if the offending information obtained when Officer Stetzenbach entered the room is ignored, the search warrant was valid.

For these reasons, we affirm the lower court's order denying the motion to suppress, and affirm the conviction.

Judge ROBERT G. ULRICH and JAMES M. SMART, Jr. concur.